## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 30 2017, 8:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Evan J. Hodge,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 30, 2017

Court of Appeals Case No.
45A03-1701-CR-111

Appeal from the Lake County
Superior Court.
The Honorable Michael J. Lambert,
Judge Pro Tempore.
Trial Court Cause No.
45G04-1412-MR-11

**Friedlander, Senior Judge**

[1] Following a jury trial, Evan Jauntae[1] Hodge was convicted of murder, a felony,[2] and carrying a handgun without a license, a Level 5 felony,[3] and was adjudicated and sentenced as a habitual offender.[4] On appeal, he raises three issues for our review:

> 1. Whether the trial court erred in admitting into evidence the murder victim's dying declaration;
>
> 2. Whether the trial court erred in admitting into evidence two police reports; and
>
> 3. Whether the State presented sufficient evidence to support Hodge's murder conviction.

We affirm.

[2] The facts most favorable to the judgment reveal that on December 18, 2014, Karen Cannon and her fiancé, Martin Joshua, III, spent the night together. The following morning, December 19, 2014, Cannon and Joshua went their separate ways but kept in contact by phone. Joshua was driving a silver Jaguar and had five or six thousand dollars in his possession. Cannon spoke with Joshua by phone around 4:00 p.m. and asked who was with him. Joshua

---

[1] We note that in the Record on Appeal, Evan Hodge's middle name is variously spelled as "Jauntay" and "Jauntae." We utilize "Jauntae."

[2] Ind. Code § 35-42-1-1(1) (West, Westlaw 2014).

[3] Ind. Code § 35-47-2-1(e)(2)(B) (West, Westlaw 2014).

[4] Ind. Code § 35-50-2-8(a) (West, Westlaw 2014).

replied, "Tay-Tay and Keyron." Tr. Vol. 2 p. 36. "Tay-Tay" was Hodge's nickname.

[3] Cannon next spoke to Joshua around 8:00 or 9:00 p.m., and Joshua said he was still with "Tay-Tay and Keyron." *Id.* at 39. After Cannon was unable to reach Joshua later that evening, she drove to the home of Joe and Ruthie Foster located in Gary, Indiana, because she knew that Joshua often spent time at the residence. Ruthie is Keyron's grandmother. When Cannon arrived, she saw an ambulance and a police officer.

[4] The Fosters were at their home on the evening of December 19, 2014, when they heard a gunshot. A few minutes later, there was a knock at the front door. Joe opened the door, and Joshua fell inside the house. Joshua's intestines were protruding from his abdomen. Joshua tried to stand up but was unable to do so. Joshua was "dazed" and "kept on moaning." *Id.* at 129. Joshua said, "Tay-Tay killed me." *Id.* at 130. Joe and Ruthie recognized "Tay-Tay" as a nickname for Hodge. A call was placed to 911.

[5] Corporal Donte Manuel and Corporal Jemel Martin with the Gary Police Department responded to the 911 call. The officers saw a silver Jaguar automobile parked outside the Fosters' house. The vehicle was running and its headlights were on, but the doors were locked and no one was inside the vehicle. When the officers entered the Fosters' home, they saw Joshua lying on the kitchen floor, "rolling around from side to side . . . [, appearing] to be in excruciating pain, [and] grabbing his lower abdomen." *Id.* at 166. Joshua had

sustained multiple gunshot wounds, including a graze wound on the left side of his chest, a wound to the left of his navel, where his intestines protruded, and a wound to his back, just above the hip. Corporal Manuel asked Joshua several times who shot him and Joshua replied each time, "Evan Hodge." *Id.* at 167.

[6] When the Gary Fire Department emergency medical technician (EMT) arrived at the Fosters' house, he observed that Joshua was "semi-conscious." The EMT and his partner began life-saving measures and then transported Joshua to Northlake Methodist Hospital. When Joshua arrived in the emergency room, he did not have blood pressure or a pulse. Medical staff attempted to resuscitate Joshua for about an hour before he was pronounced dead. An autopsy was performed, and the coroner determined the cause of death was the gunshot wound to the abdomen.

[7] When Corporal Manuel and Corporal Martin investigated the scene of the crime, they found a cell phone and one thousand dollars in loose currency on the Fosters' front porch and two shell casings near the Jaguar. Two plastic cigar tips and a cigarette butt also were found near the Jaguar. DNA testing of the cigar tips and the cigarette butt revealed a profile that was consistent with that of Hodge. A sample taken from a "large glob of spit" found at the scene indicated an enzyme found in saliva and a DNA profile also consistent with that of Hodge. Tr. Vol. 3 p. 17.

[8] On December 29, 2014, the State charged Hodge with murder. On November 19, 2015, the State amended the information by adding carrying a handgun

without a license, as a Level 5 felony, and a habitual offender enhancement. At trial, and over Hodge's objections, the State introduced testimony related to statements made by Joshua that he was shot by Hodge. The trial court overruled the objections and admitted the statements as dying declarations. The trial court also admitted into evidence, over Hodge's objections, two police reports. At the conclusion of the trial, the jury found Hodge guilty as charged. He was sentenced to eighty-five years in the Indiana Department of Correction.[5]

[9] The first issue we address is whether the court abused its discretion in admitting certain evidence at trial. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Joyner v. State*, 678 N.E.2d 386 (Ind. 1997). We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Id*.

[10] Hodge challenges the court's decision to admit into evidence Joshua's statements identifying Hodge as the person that shot him, and the court's decision to admit into evidence two police reports. We address each of Hodge's challenges separately.

[11] Hodge argues the trial court erred in admitting Joshua's statements identifying Hodge as the person that shot him. According to Hodge, the statements did not

---

[5] Hodge was found to have used a firearm when he committed his crimes, and his sentence was enhanced by ten years under Indiana Code Section 35-50-2-11 (West, Westlaw 2014).

qualify as dying declarations and constituted hearsay because no evidence was presented that Joshua believed his death was imminent. In support of his argument, Hodge points to testimony from Joe Foster that at the time of the shooting, Joshua appeared "dazed," and testimony from the EMT that Joshua suffered from "typical gunshot injuries." Tr. Vol. 2 pp. 129, 225. The State maintains that it was apparent from Joshua's statements and physical condition at the time of the shooting that he knew his death was imminent.

[12]  Out-of-court statements offered in court for the truth of the matter asserted are generally inadmissible hearsay. *See* Ind. Evidence Rules 801(c)(2), 802. However, one exception to the inadmissibility of hearsay is an out-of-court statement that is "[a] statement that the declarant, while believing the declarant's death to be imminent, made about its cause or circumstances." Evid. R. 804(b)(2). The admissibility of such a "'dying declaration'" is based on "the belief that persons making such statements are highly unlikely to lie." *Idaho v. Wright,* 497 U.S. 805, 820, 110 S. Ct. 3139, 3149, 111 L. Ed. 2d 638 (1990).

> In order to determine if a declarant made statements with the belief that death was imminent while having abandoned all hope of recovery, the trial court may consider the general statements, conduct, manner, symptoms, and condition of the declarant, which flow as the reasonable and natural results from the extent and character of his wound, or state of his illness.

*Wright v. State*, 916 N.E.2d 269, 275 (Ind. Ct. App. 2009) (quotations omitted), *trans. denied*.

[13] We find that Joshua's statements that Hodge shot him were properly adjudged to be dying declarations. Joshua was shot multiple times, including once in the abdomen. His intestines were protruding from his abdomen. Joe Foster testified that Joshua fell through the front door of his house, was unable to stand, appeared "dazed," "kept on moaning," and said, "Tay-Tay killed me." Tr. Vol. 2 pp. 129, 130. Police officers testified that when they encountered Joshua at around 11:20 p.m., he was writhing on the floor in "excruciating pain," and was "screaming out." Id. at 166, 199. At that time, Joshua was able to tell the officers that Hodge shot him. However, by approximately 11:35 p.m., the time the EMTs departed the scene with Joshua in the ambulance, Joshua was unable to respond when the EMTs asked him his name.

[14] When Joshua was brought into the emergency room, he did not have blood pressure or a pulse. Medical staff had to provide him with "a lot of blood and blood products" to resuscitate him so that surgery could be performed. Id. at 111. Joshua's right iliac vein was lacerated which caused "larger amounts of blood and [a] large amount of hemorrhage inside . . . [his] belly cavity." Id. at 124. Just before Joshua entered the operating room his blood pressure and his pulse, again, were lost. He "began to code" at 12:58 a.m., and was pronounced dead at 1:55 a.m. State's Ex. 48. The cause of Joshua's death was the gunshot to his abdomen.

[15] In light of Joshua's statements, conduct, manner, symptoms, and condition, as well as the reasonable and natural results from the extent and character of his wounds, the trial court acted within its discretion when it concluded that

Joshua's statements were admissible dying declarations. No error occurred here.

[16] Hodge next argues that the trial court erred in admitting into evidence two police reports that, according to Hodge, contained hearsay. The first report was prepared by Corporal Martin, and it contained the following information: "[Joshua] had been shot twice in the stomach by a male black [sic] name[d] Evan Hodge while he was outside of [the] Foster residence." State's Ex. 10. The second report was prepared by Corporal Manuel, and it contained the following information regarding Joshua's condition the night of the shooting: "He was in extreme pain, while also screaming 'help me help me' [sic]." State's Ex. 6. The second report also contained Joshua's identification of who shot him.

[17] Hodge concedes that he did not object during trial to the admission of the police reports on the basis of hearsay, but now claims that the admission amounts to fundamental error.[6] "A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred." *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). "The fundamental error exception is 'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error

---

[6] At trial, Hodge objected to the admission of the two police reports on the basis that the reports were duplicative. The trial court overruled the objections and admitted the reports into evidence.

denies the defendant fundamental due process.'" *Id*. (citation omitted). The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process, and this exception is available only in egregious circumstances. *Id*.

[18] Hodge contends that admission of the police reports amounted to fundamental error because they "caused him substantial harm in that [the reports] unfairly highlighted the amount of pain Mr. Joshua was in as a result of being shot and again emphasized that [Mr. Joshua] identified Mr. Hodge as the one who shot him." Appellant's Br. p. 13. We disagree. To the extent that the police reports refer to Joshua's condition following the shooting and to Joshua's statements that Hodge shot him, the references merely were cumulative of the Fosters', the police officers', and the EMT's trial testimony. Therefore, even assuming that the admission of the reports was erroneous, their admission was not a blatant violation amounting to fundamental error. *See Tobar v. State*, 740 N.E.2d 106, 108 (Ind. 2000) (holding evidence that is merely cumulative of other evidence presented at trial is not grounds for reversal).

[19] Hodge further argues that the State's evidence is insufficient to support his conviction for murder. When we review a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Sandleben v. State*, 29 N.E.3d 126 (Ind. Ct. App. 2015), *trans. denied*. Instead, we consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id*. If there is substantial evidence of probative value from which a reasonable factfinder could have found the

defendant guilty beyond a reasonable doubt, the verdict will not be disturbed. *Labarr v. State*, 36 N.E.3d 501 (Ind. Ct. App. 2015).

[20] A conviction of murder may be sustained on circumstantial evidence alone. *Green v. State*, 587 N.E.2d 1314 (Ind. 1992). The reviewing court need not determine that circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but only that an inference may reasonably be drawn which supports the finding of guilt. *Id.* "Elements of offenses and identity may be established entirely by circumstantial evidence and logical inferences drawn therefrom." *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind. 1990).

[21] Hodge challenges the adequacy of the State's evidence that he knowingly or intentionally killed Joshua. Specifically:

> Mr. Hodge concedes that there is circumstantial evidence in that he was with Mr. Joshua during the day of December 18 [sic], 2014[,] and was at some time in the vicinity of the Foster residence where Mr. Joshua was found, but the presence of Mr. Hodge's DNA does not indicate the time when he was in the vicinity of the Foster residence. Even assuming that Mr. Hodge was the one who shot Mr. Joshua, the evidence was equally susceptible to the conclusion that it was done intentionally, accidentally, in self-defense, or in sudden heat. . . . Because there was no evidence concerning the nature of the shooting, however, the elements of knowing or intentional should not be inferred.

Appellant's Br. pp. 14-15.

[22] To convict Hodge of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed Joshua. *See* Ind. Code § 35-42-1-1(1) (2014). A person "knowingly" kills when aware of a high probability that he is engaged in a killing. *See* Ind. Code § 35-41-2-2(b) (1977). A person acts intentionally if "when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). "Both intentional and knowing actions may be inferred from the circumstances." *Ritchie v. State*, 809 N.E.2d 258, 270 (Ind. 2004).

[23] Joshua's fiancée testified that on the day of the shooting, she spoke with Joshua at around 8 or 9:00 p.m. and that Joshua told her he was with "Tay-Tay." "Tay-Tay" is Hodge's nickname. Joshua was shot around 11:00 p.m. Joshua was shot at least two times. After Joshua was shot, he stumbled into the Fosters' home and stated "Tay-Tay killed me." Tr. Vol. 2 p. 130. The Fosters recognized "Tay-Tay" as a nickname for Hodge. When police officers arrived at the Fosters' home and spoke to Joshua, Joshua told the officers multiple times that he had been shot by Evan Hodge. Hodge's DNA was found on two plastic cigar tips, on a cigarette butt, and in saliva found at the scene of the shooting. A police detective testified that the cigar tips "appeared to be fairly fresh" and were not crushed or broken. Tr. Vol. 3. p. 32. The outside temperature the night of the shooting was twenty-seven degrees, yet testimony revealed that when the saliva was discovered shortly after the shooting occurred, the saliva still was wet and was not frozen. The jury could have

inferred from the evidence that Hodge knowingly or intentionally killed Joshua. Hodge's conviction for murder was supported by sufficient evidence.

[24] Based upon the foregoing, the trial court did not abuse its discretion when it admitted into evidence Joshua's dying declaration and the two police reports. The State presented sufficient evidence to support Hodge's conviction for murder.

[25] Judgment affirmed.

Riley, J., and May, J., concur.